IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 3, 2024

## STATE OF TENNESSEE v. MATTHEW SMITH

**Appeal from the Criminal Court for Shelby County**
**No. 20-03809          Chris Craft, Judge**

_____

## No. W2023-00482-CCA-R3-CD

_____

After a Shelby County jury trial, Defendant, Matthew Smith, was convicted of aggravated rape, aggravated burglary, robbery, and theft of property valued at $10,000 or more but less than $60,000. The trial court sentenced him to an effective term of thirty years in the Tennessee Department of Correction (TDOC). On appeal, Defendant argues the evidence produced at trial was insufficient to sustain his convictions and that his dual convictions for robbery and theft violate his protections against double jeopardy. We conclude the evidence was sufficient to sustain Defendant's convictions, but we also conclude the trial court should have merged Defendant's convictions for robbery and theft. We, therefore, remand the case to the trial court to merge the appropriate counts but affirm the judgments of the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified; Case Remanded**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

Phyllis Aluko, District Public Defender, and Tony N. Brayton (on appeal), Barry Box, and Kathy Kent (at trial), Assistant District Public Defenders, for the appellant, Matthew Smith.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Jose Leon and Gavin Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Background

Defendant was convicted for breaking into the home the eighty-one-year-old victim shared with her husband, raping her, and stealing property belonging to the homeowners: two televisions and a Jeep. Defendant had performed various gardening and housecleaning tasks for the couple approximately once per month over the past several years before the offenses.

At trial, the victim testified that she went to bed in a downstairs bedroom the night of February 15, 2020, while her husband slept in an upstairs bedroom at the opposite end of the house. The couple had a small dog that slept in the room with the victim's husband. The victim testified it was unlikely that her husband would have been able to hear what transpired in her room.

The victim awoke in the early morning hours on February 16 feeling pressure on her chest. She discovered a man "taking off my pajama bottoms, who then forced me to have intercourse without my permission, held me down, and crushed my chest." She added, "I can't tell you what was going through my mind except panic, help, I'm being attacked, I can't breathe. It's chest pains and then I was penetrated in my vagina by his penis. And I thought now I know why it's so painful." During the attack, the victim screamed and "yelled I can't breathe, I'm gonna die, help, stop, get out of here. And it didn't matter until he left."

The victim testified that the attacker did not say anything to her during the attack but made "sounds." She eventually freed her arms and was able to feel braids on the side of the attacker's head. The victim did not know if Defendant had braids similar to those she felt during the attack. The victim identified police photographs of her home, taken shortly after the attack, which showed the window air conditioning unit in an upstairs bedroom on the floor inside the bedroom, as if the unit had been pushed into the room from outside. The window to the room was open. The victim testified this room was directly above the roof of a first floor "sun room" that extended from the house. She stated that one of the sun room's windows "had been sealed with a screen and a storm window," but saw after the attack "[i]t was broken out and the pieces [were] lying . . . on the floor." The victim said that with the air conditioner removed, "someone standing on the sun room roof could easily enter that bedroom upstairs." The victim stated that this second-floor room was next to the bedroom in which her husband slept the night of the attack.

Once the assailant concluded his attack, he left through the garage, and the victim called 911 around 1:30 a.m. The victim testified that some of her possessions that had been

present at the house before the attack were missing. These items included two televisions and her Jeep, which she bought new the previous year for $34,053.62. The State introduced the Jeep's purchase receipt as an exhibit during the victim's testimony.

Officers with the Memphis Police Department (MPD) arrived and took the victim to the Shelby County Rape Crisis Center. The center was closed, so the victim remained in the back of the police car briefly before she asked to be taken to the hospital because of her chest pains and difficulty breathing. An ambulance transported her to the hospital where she was treated. The victim testified she suffered two broken ribs, although hospital records indicated she suffered one broken rib. Around 2:30 p.m. that day, the victim was transported to the Rape Crisis Center, where she underwent a physical exam and gave a statement to police. While at the center, the police showed the victim a photographic array of six black men with braids. The victim identified Defendant's photograph.

Although the victim did not see her assailant enter the room and did not see the assailant's face during the attack or as he ran from the house, she testified she and her husband came to believe that Defendant was the assailant "[a]s soon as he left the house." The victim testified that she had known Defendant personally and by name for several years because Defendant had done yard work and other odd jobs for the victim and her husband during that time. She said Defendant also had worked inside her house before. The victim said that Defendant did not have permission to enter her house that night, to penetrate her, or to take her property.

The victim testified the assailant wore a "gray hooded jacket" as he left her house. When shown a gray hooded sweatshirt[1] recovered at Defendant's residence, she acknowledged it "look[ed] like" the "gray hooded jacket" she saw the assailant wearing during the attack. However, she said she did not know whether the sweatshirt she was shown was the exact same shirt the assailant wore during the attack.

The victim's husband, A.S., testified that he awoke in the early morning hours after the attack when his dog barked. A.S. did not hear anyone enter the bedroom next door to his upstairs bedroom and said he would not have been able to hear anything that occurred in his wife's bedroom during the attack. After his dog barked, A.S. went downstairs and saw a man running from the house. At first, A.S. could not see the assailant's face; he could only see the assailant's back. The assailant was "wearing a hoodie . . . sort of a gray, gray jacket with [a] hood on it." The assailant grabbed car keys as he ran out the door.

---

[1] The gray hooded sweatshirt shown to the victim and her husband was introduced through the victim's testimony as Exhibit 14. A later witness testified Exhibit 14 was recovered from Defendant's residence. As examined below, the police recovered a separate gray hooded shirt in the pile of clothes left next to the hot tub in the victim's sun room. A photograph of this second gray shirt appears as Exhibit 16, and the shirt itself was introduced as Exhibit 22. No photograph of Exhibit 14 appears in the record.

When shown the same gray sweat shirt his wife was shown, A.S. acknowledged it "appear[ed] to be the jacket that the individual was wearing," but added, "It could have been any other gray shirt that he was wearing[.]" A.S. testified that his wife's Jeep and two televisions were missing from the house after the incident, although A.S. did not see the assailant carry the televisions from the house.

When the assailant took a left turn to run out of the house, A.S. "thought" that he "recognized [Defendant] from his profile." A.S. testified that he and his wife had known Defendant for several years because Defendant had performed yard work and other "handyman work" inside and outside the house A.S. and the victim shared, as well as at the couple's cabin in Mississippi. A.S. estimated that he had seen Defendant one hundred to two hundred times in his life; the last time A.S. saw Defendant was the afternoon before the attack, when Defendant arrived at the house asking to borrow $8, which A.S. gave to Defendant. However, A.S. acknowledged he did not identify Defendant as the assailant when the police first visited the crime scene. A.S. did identify Defendant as the assailant once officers showed him Defendant's identification card.

A.S. testified that after the attack he found the window air conditioning unit in an upstairs room, with the bedroom's window "broken out" and the unit on the floor. This room was next to the room in which A.S. slept the morning of the attack. A.S. recalled that some time after the attack, he looked outside the broken window and "it looked like someone had come in through there." A.S. looked down through this window and "saw a red jacket lying on the concrete floor of the little hot tub room[.]" The police retrieved this jacket, which A.S. testified was not his.

MPD Sergeant Julius Burks was one of the officers who responded to the 911 call at the victim's house. On his way to the crime scene, he saw a Jeep at a stop sign that "was just sitting there." He said that Jeep was parked no more than a quarter mile from the victim's house. After looking at the Jeep more closely, Sergeant Burks noticed the Jeep "looked like the vehicle [that was] part of the call that we had gotten." He then parked behind the Jeep and looked inside with his flashlight. Inside the Jeep, Sergeant Burks saw two large television sets, which had been referenced in the dispatch he had received.

After MPD crime scene investigators responded to the Jeep's location, Sergeant Burks continued to the victim's house. He recalled seeing signs of a struggle inside the house, an air conditioning unit in an upstairs bedroom that had been pushed out of the window onto the floor, and clothing that "didn't appear to belong to the people that lived there."

MPD Crime Scene Investigator Lee Walker was dispatched to the site where the Jeep was recovered in the early morning hours of February 16, 2020. He photographed the

Jeep, but because MPD did not conduct inventory searches of vehicles at night, he arranged to have the Jeep towed to the investigation unit for searching during the day. Investigator Walker then went to the victim's house, where he took photographs. He recalled taking photographs of a pile of clothes located next to the victim's hot tub, which was located in the downstairs sun room. The clothes included a gray hooded sweatshirt, gloves, and a black-and-red jacket. Inside one of the jacket's pockets, he found a wallet. Inside the wallet were various credit cards and a Tennessee state identification card, all of which bore Defendant's name.

Investigator Walker took photographs of the bedroom above the sun room; like the victim and her husband, the investigator testified that he believed the assailant entered through this window. The window air conditioning unit and the window ledge were dusted for fingerprints, but no usable prints were gathered from these two areas.

MPD Crime Scene Investigator Charles Cathey processed the Jeep after it was brought to the investigation unit. He removed the two televisions that were inside the Jeep, and dusted the Jeep and the televisions for fingerprints. Officer Nathan Gathright, a latent print examiner with the MPD Crime Scene Investigation unit, identified Defendant's fingerprint on an impression taken from one of the televisions found inside the Jeep.

About five or six hours after MPD was notified about the offenses, MPD Officer Geremy Moore went to the address listed on Defendant's identification card, which was "[p]retty much the next street over" from the victim's house. There, he and other officers located Defendant. MPD Crime Scene Investigator Jackson Ngien collected DNA samples from Defendant by collecting buccal swabs, swabs from his "penile area," and scrapings from beneath his fingernails.

Kristine Gable was a sexual assault nurse examiner at the Shelby County Rape Crisis Center at the time of the offense. The examiner conducted the sexual assault examination of the victim after she was discharged from the hospital, and testified that the victim had been treated for shortness of breath and a rib fracture at the hospital. She also interviewed the victim as part of the examination, and a written summary of the interview was read into the record. The interview was largely consistent with the victim's trial testimony, though in the interview the victim added that she felt braids on the assailant's head "which [Defendant] has" and that the assailant "made noises in a high pitch[ed] voice like [Defendant] has."

Ms. Gable then read into the record her findings as to the victim's injuries. She testified that the victim had several bruises on her left arm, including the wrist and elbow area, bruises on her left hand, bruises on her right arm, and bruising on her abdomen. The examiner also conducted a genital examination of the victim. The victim's genital area

exhibited hyperemia, which the examiner said "means very, very red." There were also bruises on the victim's labia "just at the entrance to the vagina." Furthermore, the nurse said the victim suffered "[m]ultiple superficial lacerations with drainage to bilateral, medial, labia minora[,] and clitoral hood." These superficial injuries were not "deep enough to need sutures . . . but it's still something that forced the skin apart so it made a laceration. It broke the skin open." The examiner said the genital lacerations were blunt force injuries, and the injuries were consistent with what the victim said happened to her.

Ms. Gable testified that the victim "said she was in disbelief and she was acting that way too." The examiner deemed the victim's reaction was not inconsistent with what she said happened to her, because different victims respond to rape differently. She collected swabs from the victim's vagina during the examination and preserved them.

MPD Detective Gloria Winfrey was the lead MPD Sex Crimes Unit investigator in this case. She was dispatched shortly after the victim's 911 call, and she followed the MPD officer who drove the victim from her home to the Rape Crisis Center the morning of the offenses. Finding the center closed, Det. Winfrey spoke with the victim in her police car. The victim told the detective that it hurt every time she took a breath. The victim initially said someone named "Maurice" had attacked her, but the victim added that the assailant was "the yard man." The victim stated that "Maurice" and his brother had worked for her and her husband for several years, although her husband was the person who usually interacted with the yard men. With the center closed, the police had the victim transported to the hospital, and the detective returned to her office.

After returning to her office, Det. Winfrey received a phone call from officers at the crime scene stating that "they found a hoodie or jacket in the sun room back at the victim's house and there was a wallet in it." The detective was provided Defendant's name as the person whose ID was found in the wallet; she then prepared a six-person photo array with the Defendant's picture and the pictures of five other black men with braids. The detective then called other officers and requested that they conduct a "knock and talk" at Defendant's listed residence, which was "right around the corner from the victim's residence[.]" There, the officers located Defendant and arrested him. The detective obtained a warrant for DNA swabs of Defendant, and she later ensured both Defendant's swabs and the victim's swabs were sent to the Tennessee Bureau of Investigation (TBI) crime laboratory.

Elizabeth Fortin, who at the time of the offense worked as a forensic scientist for TBI, conducted the DNA testing in this case. In examining the vaginal swabs taken from the victim's rape kit, she observed the presence of spermatozoa, or sperm cells. She obtained DNA from the sperm cells and found that the "sperm fraction" DNA matched Defendant's DNA standard.

MPD Lieutenant Vikki Shabazz testified that she showed the victim the photo array Det. Winfrey had prepared, and that the victim made a "positive identification" of Defendant as her assailant. The lieutenant was also present at Defendant's residence at the time of his arrest. She obtained permission to search the residence, and testified that a gray hooded sweatshirt was found near a couch on which Defendant was seated following his arrest. This sweatshirt was the exhibit shown to the victim and her husband during their testimony.

Defendant did not testify or present any evidence on his behalf. After its deliberations, the jury found Defendant guilty of aggravated rape, aggravated burglary,[2] robbery,[3] and theft of property valued at $10,000 or more but less than $60,000. After a sentencing hearing, the trial court imposed an effective sentence of thirty years in TDOC. This appeal followed.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant contends the evidence produced at trial was insufficient for the jury to find him guilty of the charged offenses beyond a reasonable doubt. The State responds that the evidence was sufficient to sustain all of Defendant's convictions.

### 1. Standard of Review

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). This standard of review is identical whether the conviction relies on direct evidence, circumstantial evidence, or a combination of both. *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, therefore, the burden is shifted to the defendant to prove why the evidence

---

[2] Defendant was indicted for especially aggravated burglary. However, before the start of trial, the trial court granted the State's motion to amend the indictment and reduce the charge to aggravated burglary.

[3] Defendant was indicted for aggravated robbery. The jury found Defendant guilty of the lesser included offense of robbery.

is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Consequently, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

## 2. Aggravated Rape

As charged in the indictment, a defendant commits aggravated rape when the defendant unlawfully sexually penetrates a victim, causes bodily injury to the victim, and acts intentionally, knowingly, or recklessly. *See* Tenn. Code Ann. § 39-13-502(a)(2). In this case, the victim awoke to find Defendant on top of her, holding her down, and removing the clothing on the lower part of her body. Defendant then penetrated the victim's vagina with his penis. The victim was treated at the hospital and examined by a sexual assault nurse examiner; hospital records reflect that the victim suffered a broken rib as a result of the attack, and the sexual assault examination revealed that the victim suffered bruising on her arms, hands, and abdomen. She also suffered bruising and lacerations to her genital area. The victim identified Defendant, whom she knew, as her attacker. Although neither the victim nor her husband saw the victim's face at the time of the attack, the victim's identification was supported by the police's recovery of Defendant's wallet— which contained Defendant's credit cards and state identification card—at the crime scene. Vaginal swabs taken during the sexual assault examination indicated the presence of sperm cells, and the DNA profile obtained from the cells matched Defendant's profile. This evidence was sufficient for the jury to determine, beyond a reasonable doubt, that Defendant intentionally, knowingly, or recklessly sexually penetrated the victim and that she suffered bodily injury due to Defendant's actions. Because the evidence was sufficient to convict Defendant of aggravated rape, he is not entitled to relief.

## 3. Aggravated Burglary

As charged in this case, aggravated burglary is burglary of a habitation. Tenn. Code Ann. § 39-14-403 (repealed July 1, 2021 and replaced with *id.* § 39-13-1003). A habitation, in pertinent part, is "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons[.]" *Id.* § 39-14-401(1)(A). As relevant to this case, "A person commits burglary

who, without the effective consent of the property owner . . . [e]nters a building . . . (or any portion thereof) not open to the public, with the intent to commit a felony, theft, or assault." *Id.* § 39-14-402(a)(1) (repealed July 1, 2021, and replaced with *id.* § 39-13-1002(a)(1)).

The indictment in this case alleged that Defendant entered the victim's residence intending to commit rape. As relevant to this case, "Rape is unlawful sexual penetration of a victim by the defendant" accomplished by force or coercion or when the victim does not consent "and the defendant knows or has reason to know at the time of the penetration that the victim did not consent[.]" *Id*. § 39-13-503(a)(1)-(2).

The trial evidence established that after Defendant raped the victim, she, her husband, and police officers found that a window air conditioning unit in an upstairs bedroom had been pushed onto the floor. A.S. and officers testified it looked like someone had come through the window. The police found clothing, including a jacket which contained a wallet with Defendant's bank cards and state identification card, next to the hot tub in the house's sun room. Because the sun room extended from the house and was located below the second floor window unit, the jury could have reasonably concluded that Defendant climbed upon the sunroom roof, pushed the window air conditioner onto the floor inside the house, and then entered the house through the open window. While no fingerprints were found on the windowsill or air conditioner, gloves were recovered in the pile of clothing left in the victim's sun room, which explains a lack of prints.

The victim said that nobody, including Defendant, had permission to enter her house the morning of the attack. The surreptitious early-morning nature of Defendant's entry and his carrying out the brutal rape of the victim despite her cries of pain and being unable to breathe established that Defendant entered the victim's home without her consent intending to rape her. *See State v. Hartshaw*, No. E2019-02200-CCA-R3-CD, 2021 WL 5861278, at *13 (Tenn. Crim. App. Dec. 10, 2021) (affirming conviction for aggravated burglary when the defendant entered the victim's dwelling at night without permission, knocked the victim to the floor, and stole money and property). Thus, the evidence was sufficient for the jury to find Defendant guilty of aggravated burglary beyond a reasonable doubt, and he is not entitled to relief.

### 4. Theft of Property

Theft of property occurs when, "with intent to deprive the owner of the property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a). "'Deprive' means to," as relevant to this case, "Withhold property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner[.]" *Id*. § 39-11-

106(a)(9)(A). "The intent to deprive may be based solely upon circumstantial evidence, and a 'jury may infer a . . . defendant's intent from the surrounding facts and circumstances.'" *State v. Stewart*, No. M2019-01421-CCA-R3-CD, 2020 WL 6494838, at *11 (Tenn. Crim. App. Nov. 5, 2020) (omission in original) (quoting *State v. Roberts*, 943 S.W.2d 403, 410 (Tenn. Crim. App. 1996)). "Moreover, the fact that the [d]efendant did not possess the owner's property for an extended period 'does not preclude a jury from finding that he possessed the requisite intent for theft.'" *State v. Hicks*, No. W2022-00920-CCA-R3-CD, 2023 WL 4230430, at *4 (Tenn. Crim. App. June 28, 2023), *no perm app. filed* (first quoting *State v. Reed*, No. M2020-00677-CCAA-R3-D, 2021 WL 4987974, at *2 (Tenn. Crim. App. Oct. 27, 2021); and then citing *State v. Gentry*, 538 S.W.3d 413, 427 (Tenn. 2017)).

Here, the evidence produced at trial established that after raping the victim, Defendant grabbed the keys to the victim's Jeep, ran out of the house, and drove away in the victim's Jeep. When the Jeep was recovered, two televisions were found in the back seat. One of the televisions bore Defendant's fingerprint. The Jeep was found close to Defendant's residence. The victim testified that Defendant did not have permission to take her Jeep. Evidence of the Jeep's value was introduced through the victim's testimony and the purchase receipt generated one year before the theft. Taken in the light most favorable to the State, such evidence was sufficient for the jury to find, beyond a reasonable doubt, that Defendant possessed the intent to deprive the victim of her property when he obtained such property without her effective consent.

Defendant contends that this evidence does not support a theft conviction because "the proof is insufficient to show that [Defendant] intended to permanently deprive the owner of the Jeep or that he exercised control of the Jeep for a period of time that substantially diminished the value or enjoyment of the Jeep to the owner." In support of this contention, Defendant claims that he "briefly used a vehicle to get away from the [victim's] residence" and that the vehicle "was quickly found parked on the street by responding officers less than a quarter mile from the [victim's] residence." However, as stated above, there is no requirement that a defendant deprive an owner of property for a prolonged period for the jury to find the defendant possessed the requisite intent for theft. *See Hicks*, 2023 WL 4230430, at *4; *Reed*, 2021 WL 4987974, at *2. In *Reed*, the defendant took a Jeep, which had its keys inside, from outside the victim's residence and drove it to a duplex located a half mile from the victim's home. 2021 WL 4987974, at *1. The police found the Jeep the same day, parked in plain view in front of the duplex. *Id.* In rejecting Reed's contention that he did not intend to permanently deprive the owners of their property because he only "took and briefly used a vehicle that did not belong to him," this court observed that Reed's "parking the Jeep where police could see the license plate does not indicate a lack of intent but perhaps merely poor planning. A jury could infer that [Reed] was 'captured too early in the criminal act' to accomplish a permanent deprivation."

*Id.* at \*2 (quoting *State v. Brown*, No. M2000-00388-CCA-R3-CD, 2001 WL 385382, at \*3 (Tenn. Crim. App. Apr. 16, 2001)). The same is true in this case.

Accordingly, we conclude the evidence was sufficient to convict Defendant of theft of property. He is not entitled to relief.

### 5. Robbery

"Robbery is the intentional or knowing theft or property from the person of another by violence or putting the person in fear." *Id.* Violence is "physical force unlawfully exercised so as to injure, damage, or abuse." *State v. Fitz*, 19 S.W.3d 213, 217 (Tenn. 2000). "[T]he use of violence or fear must precede or be contemporaneous with the taking of property from the person to constitute the offense of robbery[.]" *State v. Owens*, 20 S.W.3d 634, 641 (Tenn. 2000).

Here, the evidence produced at trial shows that Defendant broke into the victim's home and raped her. During the rape, the victim suffered a broken rib; this injury and the multiple bodily and genital bruises the victim suffered reflected the violent nature of the attack. The victim also testified she was afraid of suffocating during the rape. After Defendant finished, he grabbed the keys to the victim's Jeep as he fled from the victim's house. As stated above, the victim's Jeep was found about a block away from the home with two televisions inside, and Defendant's fingerprint was found on one of the television sets.

Defendant takes exception to his robbery conviction on several grounds. He argues, "No act of violence or fear immediately preceded or accompanied the theft of the vehicle or television sets." He claims that "the television sets were loaded into the vehicle before [the victim] was assaulted" and that neither the victim nor her husband saw Defendant taking the television sets. Defendant also argues that at the time of her rape, the victim was "unaware that any of her property had been or would be taken." Defendant also points to the victim's testimony that she was in fear during the rape but not after the attack. Thus, he claims "the taking of property in this case was not accomplished by the use of violence or putting a victim in fear" for purposes of the statute.

We find Defendant's arguments unavailing. As the State observes in its brief, "the temporal proximity between the taking of property and the use of violence or fear is the sole relevant factor" distinguishing a robbery from a theft. *State v. Swift*, 308 S.W.3d 827, 828 (Tenn. 2010). A consideration of the temporal proximity analysis focuses on "the circumstances indicative of the defendant's conduct and intent to determine whether, at the moment in time at issue, the defendant has definitively completed every element of the underlying theft." *State v. Henderson*, 5331 S.W.3d 687, 696 (Tenn. 2017). A robbery "is

complete once the accused has completed his theft of all the property he intended to steal." *Id.* at 698. Regarding the use of violence or placing the victim in fear, the Tennessee Supreme Court has stated, that to satisfy that element, "The theft of property . . . must be the result of the force or fear or must have been facilitated or made less difficult by the violence." *Owens*, 20 S.W.3d at 638 (citing *Register v. State*, 97 So. 2d 919, 921-22 (Miss. 1957)).

This court previously rejected similar arguments in a case in which, like the current case, a defendant contended both that the violence involved in an especially aggravated robbery case was not temporally linked to the taking of the victim's vehicle and that the vehicle was not taken from the victim's person or presence. In *State v. Rattler*, No. E2015-01570-CCA-R3-CD, 2016 WL 6111645, at *1 (Tenn. Crim. App. Oct. 19, 2016), the victim returned home from dinner with his mother and was confronted by the defendant's pointing a rifle at him. The victim disarmed the defendant and called 911, but during the call, the defendant stabbed the victim and cut his throat. *Id.* After a struggle, the victim ran toward the exit, at which time the defendant stabbed him twice in the back. *Id.* The victim somehow survived the attack, running toward his mother's house and screaming for help. *Id.* While the victim was running away, the defendant entered the victim's car, which was parked outside the house with the keys it, and attempted to drive away before being stopped by police. *Id.* at *1, *12.

We affirmed Rattler's conviction for especially aggravated robbery. In rejecting Rattler's argument of a lack of a temporal link between the violence and the taking, we concluded:

> [T]he evidence establishes that the Defendant's use of violence against the victim immediately preceded his theft of the victim's vehicle. Moreover, the Defendant's use of violence made theft of the car less difficult. The victim fled his home and the area of his vehicle because the Defendant pursued him with a knife and stabbed him repeatedly. Thus, the infliction of serious bodily injury through the use of a deadly weapon was the means by which the Defendant obtained control over the victim's property.

*Id.* at *11. Regarding Rattler's contention that the robbery conviction was improper because the victim's truck was not taken from his person or in his presence, we observed that "as noted by this court in *State v. Nix*, the current version of the robbery statute does not require a 'taking,' and therefore, 'an offender can commit a robbery without any degree of asportation or physical taking.'" *Id.* (quoting *State v. Nix*, 922 S.W.2d 894, 900-01 (Tenn. 1995). This court further observed in *Nix*:

> [I]f an offender, with the intent to deprive the owner, asserts control over property by means of the owner or possessor being removed from the presence of the property by force or fear, the offense of robbery is committed to the same degree that it is if the offender carries the property away from the victim's presence.

*Nix*, 922 S.W.2d at 901.

In this case, after Defendant completed a violent rape that left the victim bruised and injured and fearing for her life, he ran out of the house, grabbed the keys to victim's Jeep, and drove away in the Jeep, which had two televisions sets inside. Defendant's use of violence and placing the victim in fear occurred shortly before he drove off in the Jeep, and Defendant's actions certainly "facilitated or made less difficult" the theft of the victim's property. Although no one saw Defendant load the televisions into the Jeep or drive the Jeep away, A.S. saw Defendant take the Jeep's keys. Regardless, our precedent makes clear that property need not be taken from the victim's person or presence to sustain a robbery conviction. Defendant's use of violence and placing the victim in fear separated her from her property, and as stated above the evidence was sufficient to establish Defendant committed theft of the victim's property. Thus, the proof was sufficient for the jury to find Defendant guilty of robbery beyond a reasonable doubt, and he is not entitled to relief.

### B. Merger of Robbery and Theft Convictions

Defendant contends that the trial court erred in failing to merge his convictions for robbery and theft. He concedes the issue is waived for failure to raise it in the court below, but he argues that he is entitled to plain error relief on the issue. The State concurs with Defendant's assessment, and we agree with the parties.

A defendant's failure to raise an issue in the trial court waives the issue on appeal. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). When an issue is waived on appeal, this court may only review the issue for plain error. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). This court will grant relief under plain error only if an appellant can establish all of the following:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is necessary to do substantial justice.

*Id.* (internal quotation omitted; citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "Because each factor must be established, [an appellate court] need not consider all five factors when a single factor indicates that relief is not warranted." *State v. Fayne*, 451 S.W.3d 362, 372 (Tenn. 2014) (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006).

Here, all five plain error factors are met. First, the record clearly establishes what occurred in the court below. During the second part of Defendant's bifurcated sentencing hearing, defense counsel observed:

> As far as the particular counts that [Defendant] was convicted of, Counts Three [sic][4] and Four should merge, Judge. I understand—as far as the sentences go, I believe they should merge. I believe that Four is a lesser-included of Three [sic] so I'd ask you to take that in consideration when making your decision.

However, the trial court entered separate judgments of conviction on Counts Two (the robbery conviction) and Four (the theft conviction). Defense counsel did not object to this decision when the trial court entered its judgments or in counsel's motion for new trial. We agree with the State that because defense counsel asked the trial court for merger of Counts Two and Four before the trial court announced sentence, Defendant did not waive the issue for tactical reasons.

Regarding the other factors, this court has observed:

> [T]heft is a lesser-included offense of aggravated robbery. *See State v. Hayes*, 7 S.W.3d 52, 55-56 (Tenn. Crim. App. 1999). Indeed, theft is an element of the offense of robbery. [Tenn. Code Ann.] § 39-13-401(a). If the elements of one offense are included within the elements of another and if both arise from the same transaction, "[W]e will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy." *State v. Watkins*, 362 S.W.3d 530, 557 (Tenn. 2012).

---

[4] In the indictment, Count One charged Defendant with aggravated rape, Count Two charged him with aggravated robbery, Count Three charged him with aggravated burglary, and Count Four charged him with theft of property.

- 14 -

*State v. Miller*, No. E2022-01040-CCA-R3-CD, 2023 WL 6055984, at *9 (Sept. 18, 2023), *perm. app. filed* (Tenn. Nov. 15, 2023). Thus, the trial court's failure to merge the robbery and theft convictions violated a clear and unequivocal rule of law. Entry of separate convictions for these offenses would adversely affect a fundamental right of Defendant, as the dual convictions would violate Defendant's protection against double jeopardy. Merging Defendant's convictions is necessary to do substantial justice to avoid double jeopardy concerns.

Accordingly, this court concludes Defendant is entitled to plain error relief on this issue. The case is remanded to the trial court for merger of Counts Two (robbery) and Four (theft).

### III. Conclusion

As stated above, we conclude the trial court should have merged Defendant's convictions for robbery and theft of property. Accordingly, we remand the case to the trial court for entry of amended judgments reflecting this merger. In all other respects, the judgments of the trial court are affirmed.

_____
MATTHEW J. WILSON, JUDGE